UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                  CASE NO. 8:25-cr-456-KKM-AAS

DESIREE DOREEN SEGARI

**UNITED STATES' RESPONSE TO DEFENDANT'S
MOTION UNDER RULE 29**

The United States, by Gregory W. Kehoe, United States Attorney for

the Middle District of Florida, responds to Desiree Doreen Segari's motion for

judgment of acquittal under Rule 29. The evidence, viewed in the light most

favorable to the Government, is sufficient for a reasonable trier of fact to find

that guilt has been established beyond a reasonable doubt. Accordingly, the

defendant's motion should be denied.

Count One of the indictment charges Segari with transmitting an

interstate communication of a threat to injure the person of another, in

violation of  18 U.S.C. § 875(c). "Whoever transmits in interstate or foreign

commerce any communication containing any threat to kidnap any person or

any threat to injure the person of another" violates Section 875(c). The

indictment charged a threat to injure the person of another but did not allege a

threat to kidnap any person. Therefore, to establish Segari's guilt, the

government is required to prove the following elements:

1

(1)     the Defendant knowingly sent a message in interstate commerce containing a true threat to injure the person of another; and

(2)     the Defendant sent the message with either recklessness as to whether it could be viewed as a true threat or intent to communicate a true threat.

The evidence proved the elements of the offense, and Segari's motion should be denied.

## I.     Summary of the Evidence Establishing a Violation of Section 875(c)

Each of the videos Segari made and posted on TikTok in Exhibits 2 and 5 constitute true threats. In these videos, she called for a movement to, in essence, "see MAGA, shoot MAGA."[1] In Exhibit 2, the video posted on August 17, 2025, she stated, "so if we all get our guns and use our second amendment right…and you see somebody with a MAGA hat pew pew that's what we do, that's the way, it's the only way. She stated her purpose for the threat: "Put them back in their basements, make them scared again to be racist, homophobic, and terrible just awful [expletive]"; and "MAGA people deserve to be terrified and scared to walk in the streets because they should know that real Americans are gonna [mouths expletive] kill them." When she posted the video on TikTok, she included the following caption:

---

[1] Segari used onomatopoeias "choo" and "pew pew" and hand gestures to clearly convey the firing of a firearm.

> #seemagapewpewmaga starting a new trend, hope it catches on.
> Please spread the word. Share this video. Repost it. Use the
> hashtag all over the internet. Let's go guys. It's time to fight back
> in a potentially effective manner. (Exhibits 6E and 7).

In Exhibit 5, the video posted on August 18, 2025, she stated, "See MAGA pew pew MAGA, see MAGA pew pew MAGA, see MAGA pew pew MAGA so these [expletive] know we ain't here to play…" while using hand gestures to mimic the firing of a gun.

Exhibits 2 and 5 are intentional communications of a true threat. Her message in both is essentially the same: see MAGA, shoot MAGA. Furthermore, her statements in Exhibits 3 and 4, which were posted after Exhibit 2 and less than seven hours before Exhibit 5, also prove her intent in posting the videos was to cause fear in anyone that could be identified as "MAGA." In Exhibit 3, Segari said "we need to do what the propaganda is doing and appeal to their emotions" because "reason and logic is not going to work" and "if you want to be able to have something click in someone's brain that isn't clicking you need to present it in a way that hasn't been presented, and you need to present it in a way that speaks to them that they understand." In Exhibit 4, she stated, "I mean guys, don't get me wrong. I'm [expletive] crazy, but I'm not that [expletive] crazy. I don't want to actually go and …kill people I went to high school with. I just want the people I went to high school with to wake the [expletive] up." She followed by posting the video in Exhibit

5, in which she communicated how anyone seen and identified as MAGA ("see MAGA") would be shot on sight ("pew pew MAGA"), and explained the purpose of shooting them on sight ("so these [expletive] know we ain't here to play"). Segari's statements in her videos prove she acted with both recklessness and intent and clearly satisfy the second element—that she sent the message with either recklessness as to whether it could be viewed as a true threat or with intent to communicate a true threat.

Timothy Miles testified that he was in Ohio when he saw Segari's video (GX 2) on TikTok. He was concerned when he saw the video, thought it was very serious, and reported it to the FBI. He also posted a comment on Segari's TikTok page (Exhibit 7). (All of the comments were redacted from Exhibit 7.)

Mary Stahl testified that she received the report of the threat from the witness in Ohio. She sent a package containing the threat information to California because, at that time, the exact location of the person who posted the threat was unknown, and TikTok headquarters are in California. The FBI investigated and determined the video was posted by Segari from Sarasota, Florida. Records from TikTok and Comcast (Exhibits 6D and 9) connected the Internet Protocol (IP) address for Segari's videos (Exhibits 1 – 5) to a residence in Sarasota. When she was arrested by the FBI, Segari admitted that she posted the videos.

4

In addition to explaining how he determined that the videos were posted on TikTok from Sarasota, Special Agent William Hauser testified that he found the threat videos online. The video in Exhibit 2 had been reposted on X (formerly Twitter) and had "gone viral"—it had been viewed approximately two million times and reposted approximately 8,700 times. He also found the video in Exhibit 5 reposted on X. (Exhibits 8A, 8B, and 8C are screen captures that show how the videos appeared when SA Hauser found them on X, and Exhibit 9 is the video in Exhibit 2 that was reposted on X by "Libs of TikTok.") SA Hauser also testified that he found the video in Exhibit 2 in a news article from India.

## II.     Summary of Segari's Rule 29 Motion

Segari made the following arguments in her Rule 29 motion[2]:

1.     The evidence did not prove that Segari transmitted her videos in interstate commerce, and a violation is limited to the transmission of a threat in interstate or foreign commerce at its inception and excludes any later dissemination by others;

2.     The language of § 875(c) prohibiting "any threat to injure the person of another" connotes a singular person; applying the statute to encompass a threat to injure a group of unnamed persons exceeds the language of the statute and fails to put Segari on notice that her speech is unlawful, rendering the statute vague

---

[2] The government's summary of Segari's arguments is based on the argument made by counsel in court and in the PowerPoint provided to the Court during the argument (filed at Doc. 69-1).

and ambiguous, triggering the rule of lenity, and requiring dismissal; and

3.    Segari's videos were protected speech under the First Amendment and were not true threats because they merely advocated for violence towards MAGA, they were too general in nature, and they were jests, hyperbole, political rhetoric and satire.

### III.    Response to Segari's Rule 29 Arguments

The Court is required to determine whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. O'Keefe*, 825 F.2d 314, 319 (11th Cir. 1987). The Government's evidence satisfied this burden of proof. The evidence proved that Segari knowingly sent a message in interstate commerce, the message contained a true threat to injure the person of another; and she sent the message with either recklessness as to whether it could be viewed as a true threat or intent to communicate a true threat. While the Government is not required to prove both recklessness and intentional communication of a true threat to satisfy the subjective mens rea element, the evidence proved both.

Segari's arguments for judgment of acquittal are not persuasive, and her motion should be denied.

6

### 1.  *Segari transmitted the threat videos in interstate commerce*.

Segari knowingly posted the videos on TikTok, which is a social media platform that shares videos throughout the United States and the world by distribution on the World Wide Web via the Internet. She asked for the video to be reposted and shared, and the videos were distributed via the Internet. Exhibit 2 went viral on X, and Exhibit 5 was also reposted on X. These videos were transmitted in commerce by Segari. She sent them to TikTok—a social media application for creating, sharing, and watching videos—for the purpose of distribution them to as many viewers as possible. Posting videos to such a social media application is "sending" or "transmitting" a communication in interstate and foreign commerce and is sufficient to satisfy the Commerce Clause, Article 1, Section 8 of the U.S. Constitution, which allows Congress to regulate the use of channels of interstate commerce, the instrumentalities of interstate commerce, and activities that substantially affect commerce. *United States v. Lopez*, 514 U.S. 549, 558-59, 115 S.Ct. 1624, 1629-30 (1995). Purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce may be regulated by Congress. *Gonzales v. Raich*, 545 U.S. 1, 17, 125 S.Ct. 2195, 2205-06 (2005). Even if local activity is not regarded as commerce, it may still be regulated by Congress if it

exerts a substantial economic effect on interstate commerce. *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 89 (1942).

"The Internet is an international network of interconnected computers ... [and is comparable] to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services." *Reno v. ACLU,* 521 U.S. 844, 850–853, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). The realities of the Internet and its functioning make it plain to all who use it that online communications travel across state lines and around the world, and by posting a message on social media, the user is sending or transmitting messages in interstate commerce. Additional proof that communication traveled from a server in one state to a server in another state should not be required.

In the district court opinion of *United States v. Baker*, 514 F.Supp.3d 1368, 1378 (N.D. Florida 2021), the court found that placing a communication on the Internet in a virtual location that can be accessed by any member of the public from anywhere in the United States or in the world satisfies the requirement that the communication be transmitted in interstate or foreign commerce. In support of that finding, the court cited to *United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006) (noting that "the Internet is an instrumentality and channel of interstate commerce"); *United States v.*

8

*Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) (same); and *United States v. Kammersell*, 196 F.3d 1137, 1139 (10th Cir. 1999) (holding that a threat that was transmitted over interstate telephone lines by utilizing Internet service falls within the scope of 18 U.S.C. § 875(c)). Citing *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001), the court also stated the fact that the defendant did not direct his message to a particular person makes no difference with respect to the interstate commerce element because the statute prohibits any threat to injure the person of another made in interstate commerce, and it does not require that the threat be made directly to the intended target. While not binding on this Court, the reasoning of the court in *Baker* should apply in cases such as this, when a defendant publishes videos on a social media platform that distributes videos via the Internet across the World Wide Web. A person posting videos on such social media platforms reasonably foresees the dissemination of the videos across state lines and possibly throughout the world. In this case, Segari had such an expectation and encouraged mass distribution when she posted her videos. Her posting of the videos on TikTok satisfies the element that the defendant knowingly sent a message in interstate commerce; such posting, by its nature, is the sending from a place in one state to a place in another state (or another country).

Segari points to *U.S. v. Haas*, 37 F.4th 1256 (7th Cir. 2022) to support her argument that the use of the Internet alone is insufficient under Section 875(c). But the Seventh Circuit has not made such a finding,[3] and a majority of Circuits to rule on the issue have held that use of the internet to send a message is sufficient proof of interstate communication. *Haas* addressed the argument by the government that it needs only to show that the Internet was used to prove a message was transmitted in interstate commerce, and the defendant's counter argument that the government was required to prove that the communication physically traveled from a server in one state to a server in another. The court identified a circuit split, with the majority of courts that had addressed the issue (the First, Second, Third, and Fifth Circuits) taking the government's position, and the minority (the Ninth and Tenth Circuits) holding that the government must prove that the online communication

---

[3] The Seventh Circuit has upheld a conviction under 18 U.S.C. § 875(c) that involved threats made over social media. *United States v. Khan*, 937 F.3d 1042 (7th Cir. 2019). Circuit Judge Brennan began the opinion with the following: "Digital platforms unleash instant and limitless capabilities; at the tap of a finger, one can touch the world. That power and freedom enables many noble pursuits. But, as this case shows, underneath the promise of modern connectivity can lurk a dark side." *Id.* at 1046.

crossed state lines.[4] The court, which was applying plain error review, did not choose sides. Instead, it stated the following:

> How the established paradigm applies to the Internet is certainly an interesting question, but this case does not require us to choose sides. Because we are reviewing only for plain error, we need not adopt a holding as sweeping as the one prevailing in the majority of circuits to have considered the issue. Nor need we insist on something as technologically reductive as proof that a communication traveled from a server in one state to a server in another, a dubious requirement that fails to take full account of the realities of the Internet and its functioning. Under a plain-error standard of review, the government's convictions survive either way.

*Id.* at 1265. The court found that the government's evidence that Haas used the Internet to transmit a post from Illinois to Russia would be more than sufficient to uphold the jury's verdict.

Segari makes an additional novel argument—that a defendant's transmission of a message must travel across state lines in the first instance, and the defendant is not responsible for any subsequent transmissions across state lines by a social media sharing application such as TikTok or X, or by

---

[4] In a nonprecedential opinion, *U.S v. Mellies*, 329 Fed.Appx. 592, 606-607 (6th Cir. 2009), the Sixth Circuit found that the district court did not err in instructing the jury that "any image of child pornography that was transmitted or received over the Internet moved in interstate commerce." It noted that the defendant's argument that an image that was transmitted or received over the internet did not necessarily move across state lines rested on slim support, and the Tenth Circuit's requirement of proof of interstate movement of online communications had been rejected by every court that had considered the issue at that time.

anyone else. Because one of TikTok's servers is in Miami, Segari asserts that unless the government shows that some other server was the first to receive Segari's videos, she cannot be held accountable for her videos being transmitted to another state. This argument is unsupported and contrary to the plain wording of the statute, which does not require a message to be sent directly from one state to another, but only requires transmission "in interstate or foreign commerce." Imposing such a requirement would make federal jurisdiction subject to random and arbitrary factors beyond the knowledge or control of any person who posts a message on a social media platform. Social media applications such as X and TikTok, by design, transmit messages and make them available to vast networks of users around the world. But, according to Segari's argument, all that would matter to determine federal jurisdiction would be which server happened to receive the transmission first. None of the courts that have addressed the issue of whether the use of the Internet alone constitutes interstate transmission or transportation have imposed such a restriction, and the Court should reject Segari's argument.

Segari's argument does demonstrate, however, why the position taken by the First, Second, Third, and Fifth Circuit[5]—that once a user submits data

---

[5] **First Circuit**: *U.S. v. Lewis*, 554 F.3d 208, 214-215 (1st Circuit 2009) (transportation of child pornography in interstate commerce); *U.S. v. Carroll*, 105 F.3d 740, 742 (1st Circuit 1997) (transportation of child pornography in interstate commerce); **Second**

via the Internet, the data has been transmitted in interstate commerce—is the better-reasoned approach and should be applied in this case. As stated by the Third Circuit in *MacEwan*, "once the images of child pornography left the website server and entered the complex global data transmission system that is the Internet, the images were being transmitted in interstate commerce. To quote the Court of Appeals for the First Circuit in *United State v. Carroll*, the 'transmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes transportation in interstate commerce.'" *United States v. MacEwan*, 445 F.3d at 244 (quoting *U.S. v. Carroll*, 105 F.3d at 742. The Fifth Circuit adopted this reasoning in *Runyan* when it joined the First Circuit in holding that transmission of photographs by means of the Internet is tantamount to moving photographs across state lines and constitutes transportation in interstate commerce. *U.S. v. Runyan*, 290 F.3d at 239. The Second Circuit found that the conclusion of the First and Third Circuits "makes perfect sense." *U.S. v. Harris*, 548 Fed.Appx. 679, 682

---

**Circuit**: *U.S. v. Harris*, 548 Fed.Appx. 679, 682 (2nd Cir. 2013) (transportation of child pornography in interstate commerce); *U.S. v. Rowe*, 414 F.3d 271, 279 (2d Cir. 2008) (offense involving transportation in interstate commerce); *U.S. v. Anson*, 304 Fed.Appx. 1, 5 (2d Cir. 2008) (transportation of child pornography in interstate commerce); **Third Circuit**: *U.S. v. MacEwan*, 445 F.3d 237, 243, 244-245 (3rd Cir. 2006) (transportation of child pornography in interstate commerce); **Fifth Circuit**: *U.S. v. Runyan*, 290 F.3d 223, 239 (Fifth Circuit 2002) (transportation of child pornography in interstate commerce).

(2nd Cir. 2013) (unpublished opinion). The court in *Baker* also agreed with this reasoning when it found that placing a communication on the Internet satisfies the requirement under Section 875(c). This Court should do the same, and not require additional evidence of movement of communications across state lines as required by the Ninth and Tenth Circuits.[6]

Even if the Court does not make a finding that Segari's use of the Internet to send her videos is, in itself, sufficient proof of interstate transmission, other evidence proves that Segari sent a threat across state lines. Timothy Miles received Segari's message when he saw her video (Exhibit 2) in Ohio. His testimony satisfies the Ninth and Tenth Circuits' requirement that the government must prove that the online communication crossed state lines.

### 2. *The statute is not confined to threats against a singular person.*

18 U.C.S. § 875(c) prohibits the transmitting "in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another." Segari argues that the statute is limited in application to a singular person because "kidnap any person" means a single specific person. Therefore, according to Segari, "any threat to injure

---

[6] **Ninth Circuit**: *U.S. v. Wright*, 625 F.3d 583, 590-595 (9th Cir. 2010) (transportation of child pornography in interstate commerce); **Tenth Circuit**: *U.S. v. Schaefer*, 501 F.3d 1197, 1200-1201 (10th Cir. 2007 (transportation of child pornography in interstate commerce).

14

the person of another" is also limited to a specific, single person. Segari's strained interpretation attempts to circumvent the plain meaning of the text and is wrong for several reasons.

First, the term "any person" in the phrase "any threat to kidnap any person" is not limited to a single person, and it does not limit the phrase that follows—"any threat to injure the person of another—to a singular construction. "Any" is general and nonspecific; it may be singular or plural.[7] "Person" is singular, but a semantic canon of statutory construction is the singular includes the plural (and vice versa), and the best drafting practice in drafting legislation is to use the singular.[8] The United States Code provides a rule of statutory construction that dictates that "person" includes the plural, "persons":

> In determining the meaning of any Act of Congress, unless the context indicates otherwise—
> words importing the singular include and apply to several persons, parties, or things; …

---

[7] According to the Merrriam-Webster dictionary, the meaning of "any" includes 1) "one or some indiscriminately of whatever kind" and 2) "one, some, or all indiscriminately of whatever quantity." Any, Merriam-Webster, https://www.merriam-webster.com/dictionary/any: (last visited January 23, 2026).

[8] *See* Semantic Canons, Canon 14; Antonin Scalia and Bryan Garner, Reading Law: The Interpretation of Legal Texts; Semantic Canons, Canon 14. "The rule is simply a matter of common sense and everyday linguistic experience: 'It is a misdemeanor for any person to set off a rocket within the city limits without a written license from the fire marshal' does not exempt from penalty someone who sets off two rockets or a string of 100. If you cannot do one, you cannot do any, or many."

1 U.S.C. § 1. The Supreme Court has provided additional explanation of that statute's application:

> The Dictionary Act does not transform every use of the singular "a" into the plural "several." Instead, it tells us only that a statute using the singular "a" can apply to multiple persons, parties, or things.

*Niz-Chavez v. Garland*, 593 U.S. 155, 164, 141 S. Ct. 1474, 1482 (2021).

Second, the plain meaning of the applicable phrase in this case, "the person of another," is the body of anyone other than the defendant.[9] The statute makes clear that it is unlawful for anyone to threaten bodily injury to anyone else. Applying the same rules of statutory construction, "the person of another" is not limited to a singular other person, but also applies to the bodies of multiple persons.

Third, application of associated word canons produces the same result: the threat element is not limited to threats against a single specific person. The Supreme Court has explained these canons:

> First, the canon of *noscitur a sociis* teaches that a word is "given more precise content by the neighboring words with which it is associated." That "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with" "the company it keeps." And under the related canon of *ejusdem generis*, "a 'general or collective term' at the end of a list of specific items" is typically "

---

[9] According to Merriam-Webster, the definition of the pronoun "another" is 1) "an additional one of the same kind; one more; 2) one that is different from the first or present one; and 3)one of a group of unspecified or indefinite things. Another, Merriam-Webster, https://www.merriam-webster.com/dictionary/any: (last visited January 23, 2026).

> 'controlled and defined by reference to' the specific classes ... that precede it." These approaches to statutory interpretation track the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it.

*Fischer v. United States*, 603 U.S. 480, 487, 144 S. Ct. 2176, 2183–84 (2024) (internal citations omitted). Section 875(c) provides alternative means of committing the threat element: a threat to kidnap (i.e., take or abduct a person) and a threat to injure (i.e., causing injury to another person). They are consistent with each other, but each is worded in a manner that is applicable to the type of threat—a "person" may be threatened to be kidnapped, but one cannot kidnap herself;[10] one could threaten to harm herself, but the statute only proscribes threats to the "person of another" (i.e., the physical body of another). Under the rules of statutory construction, both types of threats are threats against other persons, and neither is limited to a singular identified person.

Fourth, the Supreme Court has stated that Section 875(c) is not limited to threats against individuals:

---

[10] The word "kidnap" means to carry anyone away by unlawful force or fraud, and against their will, or to seize and detain the person for the purpose of so carrying them away. 51 C.J.S. Kidnapping § 1. Under 18 U.S.C. § 1201(a), kidnapping includes unlawfully seizing, confining, abducting, or carrying away and holding for ransom any person.

> "True threats" encompass those statements where the speaker
> means to communicate a serious expression of an intent to
> commit an act of unlawful violence to a particular individual *or*
> *group of individuals.*

*Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 1548 (2003) (emphasis added). In *Black*, the Supreme Court found that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person *or group of persons* with the intent of placing the victim in fear of bodily harm or death." *Id*. (emphasis added). That is what Segari did here—she directed a threat to a group of persons with the intent to intimidate the group by putting them in fear of bodily harm or death. The Supreme Court—the majority and the dissent—cited *Black* multiple times in *Counterman v. Colorado*, 600 U.S. 66, 143 S.Ct. 2106 (2023), when it held that the First Amendment required proof in a criminal action regarding a true threat that the defendant had some subjective understanding of the threatening nature of the statements, and determined reckless is the appropriate mens rea. Quoting from *Black*, the dissent noted that the First Amendment has allowed the regulation of certain areas of speech, including true threats, which are "serious expression[s] of an intent to commit an act of unlawful violence to a

18

particular individual or group of individuals." *Id*. at 600 U.S. 107, 143 S.Ct.

2133 (Justice Barrett, with whom Justice Thomas joins, dissenting.)

     The Seventh Circuit considered whether Section 875(c) requires a threat

to be directed at a specific individual when it affirmed a conviction in *United

States v. Khan*, 937 F.3d 1042 (7th Cir. 2019). Khan used Facebook to threaten

mass murder, posting messages threatening to "kill," "shoot," "hunt,"

"murder," and "put bullets in his targets." He aimed for "a real human

tragedy" and claimed a "free kill zone." *Id*. at 1046. Khan appealed his

conviction for making interstate threats to injure others and asserted that the

government failed to prove the target of the alleged threats. The court rejected

that argument, and noted that Khan in fact called his victims "targets" and

they included college students, people walking their dogs, truckers, and

anyone else who happened to be in the wrong place at the wrong time. *Id*. at

1055.

     The case Segari references, *Borden v. United States*, 593 U.S. 420, 141 S.

Ct. 1817 (2021), does not hold or suggest that "the person of another" is

limited to a singular person. *Borden* only addressed the issue of whether a

mens rea of recklessness was sufficient to constitute a "violent felony" under

the elements clause of the Armed Career Criminal Act (ACCA).  ACCA

mandates a mandatory sentence for persons found guilty of illegally possessing

a firearm who have three or more prior convictions for a "violent felony." Under ACCA's elements clause, an offense qualifies as a "violent felony" if it necessarily involves "the use, attempted use, or threatened use of physical force *against the person of another*." 18 U.S.C. § 924(e)(2)(B)(i) (emphasis added). Concluding that a criminal offense that requires only a mens rea of recklessness cannot count as a "violent felony" under the ACCA elements clause, the majority explained its conclusion followed from the statutory text. "The phrase 'against another,' when modifying a volitional action like the 'use of force,' demands that the perpetrator direct his force at another individual." *Borden v. United States*, 593 U.S. 420, 420, 141 S. Ct. 1817, 1819 (2021). It excludes reckless conduct "that is not directed or targeted at another." *Id*. at 444.

     *Borden* did not impose a requirement that a prior offense, to qualify as a "crime of violence," must be limited to an action directed at or targeting a single individual. Such an interpretation would produce absurd results, and the Supreme Court has not imposed such a rule. While it excludes from the definition of "violent felony" reckless conduct, such as the reckless operation of a motor vehicle, *Borden* would not preclude intentional crimes perpetrated against groups of people, such as first degree or second-degree murder, from qualifying as violent felonies. A conviction under Florida law for either first-

degree or second-degree murder is categorically a violent felony. *Hylor v. United States*, 896 F.3d 1219 (11th Cir. 2018); *United States v. Jones*, 906 F.3d 1325 (11th Cir. 2018). Florida defines first-degree murder as "[t]he unlawful killing of a human being…[w]hen perpetrated from a premeditated design to effect the death of *the person killed or any human being*," and second-degree murder to mean "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although *without any premeditated design to effect the death of any particular individual*." Fla. Stat. § 782.04(1) and (2) (emphasis added). Thus, mass murders would qualify as first-degree or second-degree murder under Florida law and are offenses "against the person of another" and violent felonies under ACCA, regardless of whether the perpetrator intended to kill or targeted a particular individual. The Court should reject Segari's unsupported argument that an equally reasonable reading Section 875(c) is that it applies only to threats against specified individuals.

Finally, Segari, and everyone else, is on notice under Section 875(c) that true threats, whether to specific individuals or groups of persons, are unlawful and not protected under the First Amendment. There is no ambiguity in the statute, and the rule of lenity does not apply here. The rule—a canon of statutory construction that requires courts to construe ambiguous criminal

21

statutes narrowly in favor of the accused—respects the rights of individuals by requiring fair warning of " 'what the law intends to do if a certain line is passed.' " *United States v. Wright*, 607 F.3d 708, 716 (11th Cir. 2010); *United States v. Bass*, 404 U.S. 336, 348, 92 S.Ct. 515, 522 (1971) (quoting *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 341 (1931)). The language of Section 875(c), however, is clear and unambiguous. It clearly proscribes threats to injure others—whether individuals or groups of people.

### 3. *Segari's videos were true threats not protected under the First Amendment.*

As the law and jury instructions make clear, a true threat is not protected by the First Amendment. The crux of the jury determination in this case is whether Segari crossed the line that separates protected First Amendment speech from unlawful true threats. The government presented sufficient evidence for the jury to find Segari made a true threat.

Segari's statements that anyone identified as a MAGA person should be shot on sight is a true threat. It was a threat designed to intimidate and put MAGA supporters in fear that any of them could be shot if Segari or anyone believing in her message identified them as a MAGA supporter. Her goal, in her own words, was to silence or diminish MAGA support through fear and intimidation ("Put them back in their basements, make them scared again to be racist, homophobic, and terrible just awful [expletive]"; "MAGA people

deserve to be terrified and scared to walk in the streets because they should know that real Americans are gonna kill them; and "so these [expletive] know we ain't here to play").

Whether Segari's videos and comments constitute a true threat or were mere political rhetoric, hyperbole, jests, or satire, is an issue for the jury to determine. The evidence, in the light most favorable to the government, is sufficient to support a finding that Segari made a true threat.

## IV.    Conclusion

For the foregoing reasons, the Court should deny Segari's motion under Rule 29. Viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in

favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By:    /s/ Michael C. Sinacore
Michael C. Sinacore
Assistant United States Attorney
Florida Bar No. 868523
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: michael.sinacore@usdoj.gov

**U.S. v. Desire Doreen Segari**          **Case No. 8:25-cr-456-KKM-AAS**

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

*/s/ Michael C. Sinacore*
Michael C. Sinacore
Assistant United States Attorney
Florida Bar No. 868523
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: michael.sinacore@usdoj.gov